UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| INDEMNITY INSURANCE COMPANY OF NORTH AMERICA; ZURICH AMERICAN INSURANCE COMPANY; and INDUSTRIAL RISK INSURERS, | CV-S-02-0236 - PMP (PAL ) |
| Plaintiffs, | O R D E R |
| v. | |
| HARRAH'S ENTERTAINMENT, INC.; MARNELL CORRAO ASSOCIATES, INC.; MCA OF LOUISIANA, INC.; and DOES I through X inclusive, and Roe Corporations I through X, | |
| Defendants. | |

Presently before this Court are three motions filed on December 19, 2003, by Defendant Harrah's Entertainment Inc. ("Harrah's"): Harrah's Motion for Partial Summary Judgment on the Issue of Occurrence (Doc. #177); Harrah's Motion for Partial Summary Judgment on the Issue of Drop Down/Attachment (Doc. #178); and Harrah's Motion for Partial Summary Judgment on the Issue of Fortuity (Doc. #179). Plaintiffs Indemnity Insurance Company of North America, Zurich American Insurance Company, and Industrial Risk Insurers ("Insurers") filed Plaintiffs' Responses to Defendants' Motions for Summary Judgment with Supporting Briefs on: "Fortuity" "Occurrence" "Drop Down" (Doc. #201) on February 20, 2004. Involuntary Plaintiff Ace American Insurance Company ("Ace") also filed Involuntary Plaintiff Ace American Insurance Company's Brief in Response to Defendants' Motions for Partial Summary Judgment on the Issues of Occurrence and Fortuity (Doc. #196) on February 20, 2004. Harrah's filed three replies on

March 19, 2004: Harrah's Reply to Plaintiffs' Responses to Harrah's Motion for Partial Summary Judgment on the Issue of Occurrence (Doc. #211); Harrah's Reply to Plaintiffs' Responses to Harrah's Motion for Partial Summary Judgment on the Issue of Drop Down/Attachment (Doc. #216); and Harrah's Reply to Plaintiffs' Responses to Harrah's Motion for Partial Summary Judgment on the Issue of Fortuity (Doc. #217).

Defendants Marnell Corrao Associates, Inc., MCA of Louisiana, Inc., and Anthony Marnell II, Chartered (collectively "MCA") also filed three motions on December 19, 2003: Motion for Partial Summary Judgment by Defendants Marnell Corrao Associates, Inc., MCA of Louisiana, Inc, and Anthony Marnell II, Chartered Regarding Drop Down (Doc. #186); Motion for Partial Summary Judgment by Defendants Marnell Corrao Associates, Inc., MCA of Louisiana, and Anthony Marnell II, Chartered Regarding Occurrence (Doc. #187); and Motion for Partial Summary Judgment by Defendant Marnell Corrao Associates, Inc., MCA of Louisiana, Inc., and Anthony Marnell II, Chartered, Regarding Fortuity (Doc. #189). The Insurers responded with the above-mentioned opposition, Plaintiffs' Responses to Defendants' Motions for Summary Judgment with Supporting Briefs on: "Fortuity" "Occurrence" "Drop Down" (Doc. #201), on February 20, 2004. Ace also answered with the above-mentioned opposition, Involuntary Plaintiff Ace American Insurance Company's Brief in Response to Defendants' Motions for Partial Summary Judgment on the Issues of Occurrence and Fortuity (Doc. #195), on February 20, 2004. MCA filed two replies on March 19, 2004: Reply of Marnell Defendants to Plaintiffs' Response to Marnell's Motions for Partial Summary Judgment Regarding Fortuity, Occurrence and Drop Down (Doc. #212) and Defendants Marnell's Reply to Involuntary Plaintiff Ace American Insurance Company's Response to Marnell's Motions for Partial Summary Judgment on the Issues of Occurrence and Fortuity (Doc. #213).

On December 19, 2003, the Insurers filed Plaintiffs' Introduction and Statement of Facts and Motions for Sumary Judgment with Supporting Briefs on "Occurrence," "Drop

Down," and "Fortuity." (Doc. #180). On February 20, 2004, Harrah's filed three oppositions: Harrah's Response to Plaintiffs' Cross-Motion for Partial Summary Judgment on the Issue of Occurrence (Doc. #202); Harrah's Response to Plaintiffs' Cross-Motion for Summary Judgment on the Issue of Fortuity (Doc. #204); and Harrah's Response to Plaintiffs' Cross-Motion for Summary Judgment on the Issue of Drop Down/Attachment (Doc. #205). MCA also filed three oppositions on February 20, 2004: Response to Plaintiffs' Motion for Partial Summary Judgment Regarding Drop Down (Doc. #206); Response to Plaintiffs' Motion for Partial Summary Judgment Regarding Fortuity (Doc. #207); and Response to Plaintiffs' Motion for Partial Summary Judgment Regarding Occurrence (Doc. #208). On March 19, 2004, the Insurers filed Plaintiffs' Replies to Defendants' Responses to Plaintiffs' Summary Judgment Motions on: "Fortuity," "Occurrence," and "Drop Down" (Doc. #219).

On December 19, 2003 Ace also filed Involuntary Plaintiff Ace American Insurance Company's Motion for Summary Judgment (Doc. #185). MCA filed Marnell Defendants' Responses to Involuntary Plaintiff Ace American's Motion for Partial Summary Judgment (Doc. #194) on February 20, 2004. On February 20, 2004, Harrah's responded with the above-mentioned oppositions: Harrah's Response to Plaintiffs' Cross-Motion for Partial Summary Judgment on the Issue of Occurrence (Doc. #202) and Harrah's Response to Plaintiffs' Cross-Motion for Summary Judgment on the Issue of Fortuity (Doc. #204),[1] and Harrah's Response to Plaintiffs' Cross-Motion for Summary Judgment on the Issue of Drop Down/Attachment (Doc. #205). MCA also filed Response to Plaintiffs' Motion for Partial Summary Judgment Regarding Occurrence (Doc. #208) on February 20, 2004. On March 19, 2004, Ace filed Ace American's Brief in Reply to Defendants' Motions Responding to Ace American's Motion for Summary Judgment on

---

[1] Harrah's third opposition dealt with Drop Down/Attachment, which is not relevant to Ace's motion for partial summary judgment.

1  Issues of Occurrence and Fortuity (Doc. #222).[2]  On June 3, 2004, the Court conducted a

2  hearing on the foregoing motions.

3  **I.      BACKGROUND**

4          The parties dispute who should bear the cost of extra materials, labor, and delay

5  when mold grew on the installed sheetrock in a casino being constructed in Shreveport,

6  Louisiana, after large amounts of rain fell in the area.  Plaintiffs Insurers, the excess policy

7  carriers, and Ace, the primary policy carrier for a portion of the time during which the loss

8  occurred, contend the Defendants, Harrah's and its builder, MCA, should bear the loss.

9  Harrah's and MCA (collectively "Defendants") disagree.

10

-------

11          [2]  The Court also has read and considered the parties' other filings: Plaintiffs' Additional
Exhibit Appendix (Doc. #181);  Involuntary Plaintiff Ace American Insurance Company's Response
12  to Defendants Harrah's and MCA's Statement of Facts in Support of Motions for Partial Summary
Judgment on the Issue of Occurrence (Doc. #192); Involuntary Plaintiff Ace American Insurance
13  Company's Evidentiary Objections to Defendants Harrah's and MCA's Statement of Facts in Support
of Motions for Partial Summary Judgment on the Issue of Occurrence (Doc. #193); Involuntary
14  Plaintiff Ace American Insurance Company's Supplemental Statement of Undisputed Facts in Support
of Motion for Summary Judgment (Doc. #195); Involuntary Plaintiff Ace American Insurance
15  Company's Response to Harrah's Statement of Facts on the Issue of Fortuity (#197); Involuntary
Plaintiff Ace American Insurance Company's Evidentiary Objections to Harrah's Statement of Facts
16  in Support of Motion for Partial Summary Judgment on the Issue of Fortuity (#198); Involuntary
Plaintiff Ace American Insurance Company's Statement of Disputed Facts in Response to MCA's
17  Statement of Facts in Support of Motion for Partial Summary Judgment Regarding Fortuity (Doc.
#199); Involuntary Plaintiff Ace American Insurance Company's Evidentiary Objections to MCA's
18  Statement of Facts in Support of Motion for Partial Summary Judgment Regarding Fortuity (Doc.
#200); Harrah's Counter-Statement of Facts Regarding Drop Down/Attachment, Fortuity, and
19  Occurrence (Doc. #203); Supplemental Statement of Facts by Marnell Defendants in Response to
Plaintiffs' Statement of Facts and Motions for Summary Judgment (Doc. #209); Defendants MCA
20  Louisiana, Inc., Marnell Corrao Associates, Inc., and Anthony Marnell II, Chartered Reply to
Involuntary Plaintiff Ace American Insurance Company's Objections to MCA's Statement of Facts in
21  Support of its Motion for Summary Judgment Regarding Fortuity (Doc. #214); Harrah's Supplemental
Statement of Facts Regarding Drop Down/Attachment, Fortuity, and Occurrence (Doc. #215);
22  Plaintiffs' Reply to Supplemental Statement of Facts by Marnell Defendants in Response to Plaintiffs'
Statement of Facts and Motions for Summary Judgment (Doc. #220); Harrah's Evidentiary Objections
23  to Ace American's Second Supplemental Statement of Undisputed Facts (Doc. #224); Marnell
Defendants' Evidentiary Objections to Ace American's Second Supplemental Statement of Undisputed
24  Facts (Doc. #228).

25

26

1     The Insurers each issued an all-risk excess property insurance policy to Harrah's
2  for the period beginning March 31, 1998, and ending March 31, 2001. (Joint Appendix
3  ("JA").)  The policies also cover MCA for losses incurred while working on a project for
4  Harrah's. (JA at 3 ("Contractors, subcontractors, and sub-subcontractors are Additional
5  Insureds as respects Builder's Risk coverage for Harrah's projects.").)

6     All of the policies contain the same language, derived from a "manuscript" policy
7  originally drafted by Harrah's and its insurance brokers (hereinafter "the policy" due to the
8  identical language in each document). (JA, Ex. 1-3; J. Matthews Depo. at 51:15-24, 53: 18-
9  23.) Section 3 of the policy states the Insurers will cover Harrah's for losses in excess of
10  $10 million up to $340 million per each occurrence. (JA at 3.)  The policies do not define
11  occurrence, nor do they expressly exclude non-fortuitous events. (JA, Ex. 1-3.)

12     Harrah's primary insurer for March 31, 1999, through March 31, 2000, was
13  United Capitol Insurance Company ("UCIC"). (JA, Ex. 4.)  In the year following, from
14  March 31, 2000, through March 31, 2001, Ace was Harrah's primary insurer. (JA, Ex. 5.)
15  Harrah's reinsured both the Ace primary insurance policy and the UCIC primary insurance
16  policy, shifting the risk first to Aster Insurance, Ltd. ("Aster") and from Aster to various
17  reinsurers located in London. (JA, Ex. 6; J. Matthews Depo. at 29:10-31.)  Presently, UCIC
18  is going through insolvency proceedings in Illinois. (Joint Statement of Facts ("JSOF") ¶ 6.)

19     On May 20, 1999, MCA and Harrah's entered in an agreement to construct a hotel
20  and low-rise expansion in Shreveport, Louisiana ("the Project"). (JSOF ¶ 11.)  The original
21  completion date for the Project was September 22, 2000. (P. Eiman Depo. at 229:9-14;
22  Deposition Exhibits ("DX"), Ex. 506 (Construction Agreement); DX, Ex. 213 (preliminary
23  project schedule attached to Construction Agreement as Exhibit E).)

24     MCA's sheetrock subcontractor, Keenan, Hopkins, Schmidt and Stowell
25  (KHS&S) began installing sheetrock in early January. (DX, Ex. 365 (Subcontract
26  Agreement between KHS&S and MCA of Louisiana); R. Wise Depo at 63-65; DX, Ex. 396

1   (KHS&S Daily Job Log for January 12-14, 2000).)  The installation of exterior skin of the

2   Project, called Exterior Insulation and Finish System ("EIFS") panels, was going more

3   slowly than anticipated, and as a consequence, KHS&S was installing sheetrock on floors

4   where EIFS panels did not cover the outside of the building.  (DX, Ex. 434 (February 14,

5   2000 Letter from Ronnie L. Jones to Randy Kuiper).)  In February 2000, several rainstorms

6   occurred in Shreveport.  (Pls.' Weather Appendix (Doc. #182).)

7          In March, the sheetrock installation continued to outpace the installation of the

8   exterior skin.  (DX, Ex. 435 (March 9, 2000 Letter from Ronnie L. Jones to Bob Martin);

9   DX, Ex. 396 (KHS&S Daily Job Log for March 9, 2000).)  March also brought many more

10  rainstorms of varying degrees and intensity.  (Pls.' Weather Appendix (Doc. #182); Pls.'

11  Introduction and Statement of Facts (Doc. #180) at 14-15.)  On March 27, 2000, Rodney

12  Wise, KHS&S's project manager, noted in his log that some of the sheetrock was

13  mildewing.  (DX, Ex. 396 (KHS&S Daily Job Log for March 27, 2000).)  On March 28,

14  2000, Randy Kuiper, MCA's project manager directed KHS&S to begin tearing sheetrock

15  out of the building.  (DX, Ex. 399.)  On April 1, 2000, MCA also retained Technical

16  Environmental Services ("TES") for advice on how to eliminate the mold in the Project.

17  (DX., Ex. 339.)

18         However, in spite of MCA's efforts throughout April, May, and June, rain

19  continued to fall on Shreveport, water continued to enter the Project, and mold continued to

20  grow on installed sheetrock.  On May 2, 2000, Harrah's project manager, Terry Meistering

21  sent an email directing MCA to stop installing new sheetrock in the building until it could

22  be determined that it would not get wet.  ((May 2, 2000, letter from Terry Meistering to Bob

23  Martin) DX, Ex. 512.)  On May 17, 2000, personnel from Harrah's, MCA, and TES held a

24  meeting on Water Damage Remediation.  (DX, Ex. 517.)  At the meeting, MCA explained it

25  could work on the elevator shafts if it used greenboard coated with Permawhite.  (Id.)

26  However, in June of 2000, mold was growing on the elevator shafts.  ((June 2, 2000, letter

1   from Terry Meistering to Mike Haire) DX, Ex. 670.)

2     On July 5, 2000, Harrah's asked its insurance broker to inform the primary and

3   excess insurers Harrah's would be filing a claim for the Shreveport loss.  (DX, Ex. 723.)

4   According to Ace, Harrah's did not notify Ace of the Shreveport loss until "sometime after

5   January 24, 2002."  (Involuntary Pl. Ace American Ins. Cos.' Mot. for Summ. J. at 16.)

6   **II.  LEGAL STANDARDS**

7     Summary judgment is appropriate if "the pleadings, depositions, answers to

8   interrogatories, and admissions on file, together with the affidavits, if any" demonstrate

9   "there is no genuine issue as to any material fact and . . . the moving party is entitled to a

10   judgment as a matter of law." Fed. R. Civ. P. 56(c).  The substantive law defines which

11   facts are material.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  All

12   justifiable inferences must be viewed in the light most favorable to the non-moving party.

13   County of Tuolumne v. Sonora Cmty. Hosp., 236 F.3d 1148, 1154 (9th Cir. 2001).

14     The party moving for summary judgment bears the initial burden of showing the

15   absence of a genuine issue of material fact.  Fairbank v. Wunderman Cato Johnson, 212

16   F.3d 528, 531 (9th Cir. 2000).  The burden then shifts to the non-moving party to go beyond

17   the pleadings and set forth specific facts demonstrating there is a genuine issue for trial.  Id.;

18   Far Out Prods., Inc. v. Oskar, 247 F.3d 986, 997 (9th Cir. 2001).

19   **III.  DISCUSSION**

20     The parties' motions for summary judgment address three issues: whether the

21   excess insurance policies require the Insurers to "drop down" and assume the liability of a

22   primary insurer who has become insolvent; whether Harrah's losses are caused by one

23   occurrence or by many occurrences; and whether Harrah's losses due to excessive rainfall

24   are non-fortuitous and thus not a covered risk under the policy.  Each party has moved for

25   partial summary on each of these issues.

26     As a preliminary issue the Court must determine what law applies.  None of the

7

1 policies contain choice of law provisions. Consequently the Court must use state choice of
2 law rules.

3       When sitting in diversity, a federal court is obligated to apply the substantive law
4 of the forum state in which it sits, including the forum state's choice of law provisions.
5 Lettieri v. Equitable Life Assur. Soc. of U.S., 627 F.2d 930, 932 (9th Cir. 1980) (citing
6 Klaxon v. Stentor Elect. Mfg., Inc., 313 U.S. 487, 496 (1941)). Nevada uses the substantial
7 or significant relationship test to determine what law applies to a contract. Sievers v.
8 Diversified Mtg. Investors, 603 P.2d 270, 273 (Nev. 1979) (allowing parties to choose what
9 law will apply to a contract as long as there is a substantial relationship to the transaction
10 and the contract is not against Nevada public policy); Sotirakis v. USAA, 787 P.2d 788,
11 789-90 (Nev. 1990) (using the significant relationship test to determine what law applies to
12 a contract that does not contain a choice of law provision). When applying the substantial
13 relationship test to an insurance contract, the Nevada Supreme Court has cited § 193 of the
14 Restatement (Second) of Conflict of Laws with approval, holding "the location of the
15 insured risk embodies a significant criterion in deciding which law governs." Williams v.
16 USAA, 849 P.2d 265, 266 (Nev. 1993) (citing Restatement (Second) of Conflict of Laws
17 § 193 (1969); Diamond Int'l Corp. v. Allstate Ins. Co., 712 F.2d 1498 (1st Cir. 1983); Jones
18 v. American Fire-Indem. Ins. Co., 442 So. 2d 772 (La. App. Ct. 1983)).

19       Here the insured Project is located in Louisiana. Additionally, the loss was
20 suffered in Louisiana where the rain fell and the mold grew. The Court agrees with the
21 parties' contentions that Louisiana law should apply.

22       Several provisions in Louisiana's Civil Code inform the Court's application of
23 Louisiana law. Most important is Louisiana's recognition of two sources of law, legislation
24 and custom. La. Civ. Code Ann. art. 1. Custom "results from practice repeated for a long
25 time" and "may not abrogate legislation." La. Civ. Code Ann. art. 3. Additionally, the Civil
26 Code states, "[w]hen no rule for a particular situation can be derived from legislation or

custom, the court is bound" to decide the matter equitably by resorting to "justice, reason, and prevailing usages." La. Civ. Code Ann. art. 4. And finally, "[l]aws on the same subject matter must be interpreted in reference to each other." La. Civ. Code Ann. art. 13.

### A. Drop Down

In cases where an insured "layers" insurance, obtaining coverage up to a certain amount with one insurer and coverage in excess of that amount from another insurer, courts have occasionally required the excess insurer to "drop down" and "essentially step into the shoes of [an] insolvent insurer." La. Ins. Guar. Ass'n v. Interstate Fire and Cas. Co., 630 So. 2d 759, 762 (La. 1994). "[T]he controlling consideration in resolving [a] drop down issue is the language of the excess policy." Id. at 762. "[T]he pertinent policy provision ordinarily is the limits of liability provision since it defines the scope of coverage." Id. (citations omitted). However, "in interpreting an insurance policy based on prior jurisprudence, the court must carefully compare the language in the policy under scrutiny with that of the policies construed in the prior cases because a difference in verbiage may dictate a difference in outcome." Id. at 763 (citing Cent. La. Elec. Co., Inc. v. Westinghouse Elec. Corp., 579 So. 2d 981, 985 (La. 1991).

In Kelly v. Weil, the Louisiana Supreme Court differentiated between several categories of excess policies. 563 So. 2d 221, 222 (La. 1990). In the first category, there are policies that state "the underlying limit of the excess coverage is dependent on 'collectibility' or 'recoverability' of the primary limits." Id. These policies clearly promote drop down. Id. In the second category are policies that state the amount of liability is the amount in "excess of the limits of the policies 'covered' in the attached schedules." Id. These policies do not require drop down because coverage is set by referring to "a fixed and predetermined amount" and is "not made dependent on recoverability or collectibility." Id. In the third category are policies that state the limit of liability is "the greater of the 'applicable limits of the scheduled underlying policies, and the applicable limits of any other

insurance collectible by the insured." Id.  Although some courts have interpreted policies in this category as ambiguous, the Kelly court held policies in the third category were not ambiguous and did not require drop down.  Id.  These three categories are not exhaustive and some policies exist that do not fit into any of the above categories.  La. Ins. Guar., 630 So. 2d at 762-63.

In addition to Louisiana jurisprudence on the issue of drop down coverage in excess insurance policies, courts also must apply Louisiana's general rules of contract interpretation to insurance contracts.  Id. at 763 (citing Smith v. Matthews, 611 So. 2d 1377, 1379 (La. 1993); Cent. La. Elec., 579 So. 2d at 985.)  Thus, courts must enforce a contract's plain meaning unless it leads to absurd consequences.  La. Civ. Code Ann. art. 2046.  Courts ascertain the parties' intent by giving the policy language its "generally prevailing meaning" and construing the provisions of the contract as a whole.  La. Civ. Code Ann. art. 2045; La. Civ. Code Ann. art. 2047; La. Civ. Code Ann. art. 2050.

Whether an insurance policy is ambiguous is a question of law.  Watts v. Aetna Cas. and Surety Co., 574 So. 2d 364, 369 (La. Ct. App. 1st Cir.), writ denied, 568 So. 2d 1089 (La. 1990).  However, "[t]he mere fact that an insurance policy is a complex instrument requiring analysis to understand does not render it ambiguous." Oxner v. Montgomery, 794 So. 2d 86, 90-91 (La. Ct. App. 2d Cir. 2001) (citing St. Paul Fire & Marine Ins. Co. v. Valentine, 667 So. 2d 534, (La. Ct. App. 1st Cir. 1995)).

If after application of the rules of construction an ambiguity remains, "a provision in a contract must be interpreted against the party who furnished its text." La. Civ. Code. Ann. art. 2056.  Although some Louisiana courts have formulated this rule as a mandate to interpret every ambiguity in an insurance policy against the insurer, "where the contract is prepared by the insured and its broker, and only presented to the underwriter for its acceptance, the reasons behind the rule of construction favoring the insured completely disappear." J. Ray McDermott & Co. v. Fidelity & Cas. Co., 466 F. Supp. 353, 361 (E.D.

La. 1979).  Furthermore, the Fifth Circuit Court of Appeals has opined that Louisiana law does not deem either party to be the drafter when the "initial draft is modified and remodified in a series of exchanges between the parties to produce an execution draft reflecting give and take between obligor and obligee."  In re Liljeberg Enters., Inc., 304 F.3d 410, 441 (5th Cir. 2002).

Additionally, courts may use the reasonable expectations doctrine to resolve an ambiguity by construing the policy "to fulfill the reasonable expectations of the parties in light of the customs and usages of the industry."  La. Ins. Guar., 630 So. 2d at 764.  Another permutation of the reasonable expectations doctrine requires courts to consider "how a reasonable insurance policy purchaser would construe the clause at the time the insurance contract was entered."  Breland v. Schilling, 550 So. 2d 609, 610-11 (La. 1989).  Under either phrasing, the reasonable expectations doctrine is an inquiry into external factors beyond the language of the contract itself.  La. Ins. Guar., 630 So. 2d at 768.

In La. Ins. Guar., the Louisiana Supreme Court noted in dicta that applying the doctrine of reasonable expectations to the issue of drop down in the case of primary insurer insolvency generally resulted in a finding that drop down was not required.  630 So. 2d at 768.  The court opined: "courts that have looked beyond policy language to other external factors, such as the premiums paid and the purpose and nature of excess insurance, have concluded that an insured lacks a reasonable expectation that in the event of his primary insurer's insolvency his excess insurer will provide drop down coverage."  Id.

The parties[3] focus their dispute on the following sections of the policy:

**3. LIMITS OF LIABILITY**
The coverage under this policy applies in excess of $10,000,000 any one occurrence;
This Company shall not be liable for more than the following limits:
$180,000,000 part of $340,000,000 per occurrence . . .

---

[3]  Only the Insurers, Harrah's and MCA have filed motions on this issue.

**46. POLICY ATTACHMENT**
This policy shall attach excess of underlying insurance (as referred to in Section 3) to the extent of recovery thereof, and excess of underlying deductibles.

(JA, Ex. 1.)

Additionally the Insurers cite an addendum to the policy, Endorsement 4, which is entitled "Drop Down Clause." (JA, Ex. 1.) The Insurers point to the language of Endorsement 4 stating "[u]pon exhaustion of the primary policy limits, this Policy shall drop down and be liable for the loss in excess of the amount attributed to the primary policy . . . ." (Id.) However, Harrah's and MCA argue that Endorsement 4 does not address the Insurers' drop down liability, but is about priority of payments between separate policies and perils, and in any event contains a clause that limits its effect on the rest of the policy.[4]  The Insurers also note the policies' list of covered risks does not include insolvency of the primary insurance carriers.  In contrast, Harrah's and MCA contend the Insurers' failure to include a maintenance or anti-drop down clause, which could protect them from liability in the event of the insolvency of the primary insurer, indicates their willingness to assume drop down liability.

Construing the policy under Louisiana law, the Court concludes the policy is ambiguous as to whether the Insurers must drop down because of UCIC's insolvency and does not fall within any of the policy categories described by the Louisiana Supreme Court in Kelly.  The policy seems to fit within the second Kelly category, which does not allow drop down, because it states that liability is in excess of a predetermined, fixed amount. However, the policy also seems to fit in the first Kelly category because it states liability attaches in "excess of underlying insurance . . . to the extent of recovery thereof . . . ." (JA,

---

[4] The clause in question states "Nothing herein contained shall be held to vary, alter, or waive any of the terms, conditions, or limitations of the policy to which this endorsement is attached other than as stated above."

12

Ex. 1 at § 46.) Consequently, the Court finds the policy fits in neither category.

Additionally, both of the parties' interpretations are reasonable. The Insurers' interpretation against drop down is reasonable because it centers on the limits of liability clause, on which the Louisiana Supreme Court has concentrated its analysis and which, in this case, states liability begins once the loss for one occurrence exceeds a fixed and predetermined amount, $10,000,000. Endorsement 4 bolsters this interpretation, because it specifically describes situations in which the Insurers will drop down; therefore, it would not be needed if the policy contained a clause requiring the Insurers to drop down in any situation where Harrah's could not collect from UCIC. However, Defendants' interpretation arguing for drop down coverage also is reasonable because § 46 of the policy states liability attaches to the excess of Harrah's "recovery" from underlying insurance, language the Louisiana Supreme Court interprets to signify drop down liability. Neither the absence of insolvency in the list of covered risks nor the absence of an anti-drop down or maintenance clause changes the Court's analysis.

Both Defendants and Insurers argue the Court should construe any ambiguity in their favor. Insurers cite article 2056 of the Louisiana Civil Code requiring interpretation of an ambiguous contract provision against the drafter. Defendants argue article 2056 only applies to standard form contracts and this policy is the product of arms-length negotiations; therefore, both parties drafted the policy and neither is entitled to a more favorable interpretation. However, Defendants also assert their interpretation should receive more weight because of separate Louisiana law that construes insurance policies in favor of coverage.[5]

---

[5] MCA also asserted at argument that, as an additional insured, having no part in the original negotiations, it was not the drafter and should not bear the burden of article 2056's mandate to interpret ambiguous provisions against the party providing the language. However, MCA did not advance this argument in any of its briefs. Additionally, MCA presented last at oral argument. Because the Plaintiffs have had no opportunity to respond, the Court will not consider this argument at this time.

1    None of the parties address Louisiana's doctrine of reasonable expectations

2    directly, but both sides offer several external facts in support of their arguments. The

3    Insurers argue Harrah's actions in reinsuring UCIC first with Aster and then again with

4    insurers located in London indicate that neither party could have intended UCIC's

5    insolvency to trigger drop down coverage by the Insurers.[6]  Additionally, the Insurers offer

6    deposition testimony from Debra Frost, an underwriter for one of the Insurers, regarding

7    notes she took during a pre-coverage meeting with representatives of Harrah's. Both the

8    notes and deposition indicate Harrah's representatives stated during the meeting and in later

9    negotiations that they did not intend the policy to include drop down liability unless the

10   entire amount of the primary policy had been exhausted, possibly by an earthquake or a

11   flood. (DX, D. Frost Depo. at 39:2, 40:21, 17:5-10; 107: 11, 108:2, 26:16, 27:2; DX, Exs.

12   35, 614-15.)

13   Harrah's responds that the negotiator's discussions regarding drop down was

14   limited to Endorsement 4 and neither Harrah's nor the Insurers raised the language in

15   section 46. Harrah's also asserts the policy was negotiated during a market period that was

16   favorable to insurance buyers and the parties agreed to include the drop down provision

17   because of Harrah's superior bargaining power. (DX, F. Matthews Depo. 377:9-19, 387-

18   388, 402-03.) Finally, Harrah's notes one of the Insurers had been involved in litigation

19   centered around the interpretation of a drop down clause and had reason to know what kind

20   of language would generate drop down liability for an excess insurer. See Zurich Ins. Co. v.

21   Heil Co., 815 F.2d 1122 (7th Cir. 1987).

22   The Court concludes article 2056, requiring interpretation of an ambiguity against

23

24   _____

25   [6] The Insurers also argue requiring them to drop down for UCIC when the above reinsurance
26   arrangement is in effect would produce an absurd and inequitable result.

1    the drafter of a contract, extends beyond the use of a standard form contract of adhesion.

2    Additionally, article 2056's language makes it clear that when a specific provision within a

3    contract is ambiguous the party that furnished the language of the provision must bear the

4    burden of any unfavorable interpretation.  Although Harrah's argues the Insurers negotiated

5    some language in the contract, it denies that sections 46 or 3 were the subject of any

6    discussion.  Thus, the Court finds that Harrah's has drafted these provisions and may not

7    benefit from any confusion they create.

8          An application of the reasonable expectations doctrine produces the same result.

9    Harrah's has offered nothing to refute the evidence of Frost's notes and testimony,

10   indicating Harrah's representatives said they did not want drop down, then later asked for a

11   certain kind of drop down, specifically described in Endorsement 4 and not at issue here.

12   Even viewing these assertions in the light most favorable to Harrah's the Court determines

13   that, knowing of these external factors, a reasonable insurance purchaser would have

14   understood that the policy did not include drop down beyond what was specified in

15   Endorsement 4.

16         The Court finds the policy is ambiguous as to whether the Insurers must drop

17   down in the case of the insolvency of the primary insurer.  Because Louisiana law requires

18   the Court to interpret an ambiguous provision against the party who furnished the language

19   and because Harrah's furnished the language in question the Court will interpret the

20   ambiguity against Harrah's.  The external evidence presented also indicates the parties

21   understood Harrah's did not ask for or expect the Insurers to drop down except as specified

22   in Endorsement 4.  Consequently, the Court denies the motions of Harrah's and MCA for

23   summary judgment on this issue.  The Court grants summary judgment to the Insurers on

24   this issue.

25         **B. Occurrence**

26         When an insurance policy calculates the amount of monetary coverage it supplies

15

on a "per occurrence" basis, the definition of occurrence assumes a singular importance. Louisiana courts most often have construed policies that define occurrence as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured" or that use other similar language in their definitions. Korossy v. Sunrise Homes, Inc., 653 So. 2d 1215, 1221 (La. Ct. App. 5th Cir.) writ denied, 660 So. 2d 878 (La. 1995) (quoting the insurance policy under interpretation). Generally, courts equate "occurrence" in an insurance policy to mean the event that caused the damage for which the insured seeks coverage. Korossy, 653 So. 2d at 1225. However, it is unclear how this definition applies when the damage is the product of multiple events.

In Lombard v. Sewerage & Water Bd., the Louisiana Supreme Court considered what part of the damage caused to adjoining properties by a lengthy construction project would constitute an occurrence under a policy containing the following definition of occurrence: "an accident or continuous or repeated exposure to conditions which results during the policy period in injury to person or to real or tangible property which is accidentally caused." 284 So. 2d 905, 915 (La. 1973). Although it noted the substitution of the word "occurrence" for the word "accident" was generally the manifestation of an intent to broaden coverage, the court declined to hold the entire amount of damage caused to the project constituted an "occurrence. Id. Instead the court held that damage to each individually owned piece of property was one occurrence regardless of whether the damages were caused by different actions taken during the construction project. Id. See also Society of the Roman Catholic Church v. Interstate Fire & Casualty Co., 26 F.3d 1359, 1363-64 (5th Cir. 1994) (applying Louisiana law) (construing an insurance policy that defines occurrence as "an accident or a happening or event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally result in personal injury or damage to property during the policy period").

16

1   It is clear why a court would apply this definition to a case involving injury to

2   multiple third parties who were not a part of the insurance agreement.  It is less clear that the

3   same definition would apply in a case involving property damage to a single property owner

4   who is also the insured.

5   [C]onstruction of the term "occurrence" in the liability insurance
    context is influenced by the public policy concern of ensuring adequate
6   compensation for injured third parties who are not parties to the
    insurance contract, and, perforce, played no part in negotiating its
7   terms . . . . In a first party property case, by contrast, the insured's
    negligence is not at issue; rather the policy insures against external
8   perils such as fires, floods, and intentional acts that cause damage to the
    insured's property . . . . As a result of these differences, a court's
9   construction of the undefined term "occurrence". . . as intended by the
    parties for use in the third party context is not necessarily applicable in
10  the context of first party property insurance.

11  World Trade Ctr. Props., L.L.C. v. Hartford Fire Ins. Co., 345 F.3d 154, 187-88 (2d Cir.

12  2003) (internal citations omitted).

13  Intertwined with the notion of occurrence is the question of which of two theories

14  should be used to determine when insurance coverage for a certain loss begins.  Under the

15  manifestation theory "property damage [occurs] when it became manifest regardless of

16  when the act from which it resulted occurred," and the discovery of the damage triggers

17  coverage.  Id. at 1226.  Under the exposure theory

18  the damage would be considered to have occurred when the act which
    resulted in damage took place, not when the damage was discovered.
19  Thus, where damage develops over a period of time from continuous or
    repeated exposure to injurious conditions, courts have determined the
20  occurrence took place either at the inception of the exposure period or
    continuously during the entire course of exposure as in asbestosis cases.
21

22  Id. (internal citations omitted).  Louisiana courts have used the manifestation theory in

23  cases involving property damage that was difficult to discover, such as cracked home

24  foundations and termites.  Korossy, 653 So. 2d at 1226; James Pest Control, Inc. v.

25  Scottsdale Ins. Co., 765 So. 2d 485, 491 (La. Ct. App. 5th Cir. 2000).  However, it is unclear

26  whether Louisiana would apply the manifestation theory to the immediately evident property

1  damage in this case.

2           Most problematic for both parties is the absence in the policy of any definition of

3  occurrence.  Defendants argue the occurrence is either the unfortunately high incidence of

4  rain and humidity in the spring of 2001 or a "massive mold infestation." (Mot. for Partial

5  Summ. J. by Defs. MCA Regarding Occurrence (Doc. #187) at 10-11.)  To support this

6  position they note the primary policy contains language that could be interpreted as

7  contemplating large amounts of damage being caused by one occurrence, something that is

8  more likely to occur under their interpretation than under that of the Insurers.[7]  Defendants

9  also argue Louisiana law defines the term "occurrence" in an insurance policy as

10  "continuous or repeated exposure to substantially the same general conditions." (Harrah's

11  Mot. for Partial Summ. J. on the Issue of Occurrence at 5 (citing James Pest Control, 765

12  So. 2d at 490; Whetstone v. Dixon, 616 So. 2d 764, 773 (La. Ct. App. 1st Cir. 1993));

13  Harrah's Reply to Pls.' Responses to Harrah's Mot. for Partial Summ. J. on the Issue of

14  Occurrence at 4-5 (citing Korossy, 653 So. 2d at 1221); Harrah's Response to Pls.' Cross-

15  Mot. for Partial Summ. J. on the Issue of Occurrence at 15-16 (citing Iberia Parish Sch. Bd.

16  v. Sandifer & Son Constr. Co., 721 So. 2d 1021 (La. Ct. App. 3d Cir. 1998); Miley v. Cont'l

17  Ins. Co., 645 So. 2d 1166 (La. Ct. App. 1st Cir 1994); Jefferson Parish Clerk of Court

18  Health Ins. Trust Fund v. Fidelity & Deposit Co. of Md., 673 So. 2d 1238 (La. Ct. App. 5th

19  Cir. 1996); Am. Auto. Assoc., Inc. v. Globe Indem.. Co., 362 So. 2d 1206 (La. Ct. App. 4th

20  Cir. 1978); Lombard, 284 So. 2d 905 (La. 1973); Alton Ochsner Med. Found. v. Allendale

21  Mut. Ins. Co., 219 F.3d 501 (5th Cir. 2000) (applying Louisiana law); Sec'y of the Roman

22  Catholic Church of Diocese of Lafayette and Lake Charles, Inc. v. Interstate Fire & Cas.

23  Co., 26 F.3d 1359 (5th Cir. 1994) (applying Louisiana law)).)  Additionally, Defendants

24  point to a letter from C.E. "Bud" Jarrat, the underwriter for both the primary insurers, UCIC

25

26  [7] The language of the primary policy is as follows: "All losses, damages, or expenses arising out of one occurrence shall be adjusted as one loss and from the amount of such adjusted loss shall be deducted the sum as outlined in the following paragraphs . . . ." (JA, Ex. 4 at 147.)

and Ace, and the Insurers, recommending an initial payment on the claim of two million dollars and stating it was possible the loss was caused by one occurrence. (February 27, 2001 letter from Bud Jarrat to Peter Seffens) DX, Ex. 180.) Finally, they argue the practical difficulty of apportioning the damages caused by each rain storm with any degree of certainty is so great as to preclude the notion that a single rainstorm could be an "occurrence" under the policy.

The Insurers argue each rainstorm or water intrusion is a single occurrence; therefore, even were the Insurers to drop down, the hundred-thousand-dollar-per-occurrence deductible would preclude a large payout. The Insurers also urge the Court to interpret the policy's ambiguity in their favor pursuant to article 2056 of the Louisiana Civil Code. Additionally, they offer a document created by Harrah's insurance broker soliciting bids for a renewal of the policy to the Insurers and other excess insurers, which states "Shreveport claim did not pierce the primary layer; claim for 2-3 occurrences." (DX, Ex. 720 at Tab 4.) Finally, they argue allowing Defendants to claim losses on sheetrock installed in April due to rainstorms that happened in March would produce an absurd consequence in contravention of article 2046 of the Louisiana Civil Code.

The Court concludes the policy is ambiguous as to how the number of "occurrences" should be determined. The Court also concludes Louisiana law does not define occurrence as a "continuous or repeated exposure," rather Louisiana law has only said an "occurrence" is the event that caused the damage allegedly covered by the policy. Korossy, 653 So. 2d at 1225. Finally, the Court concludes issues of material fact remain regarding what caused the damage to the Project.

The parties have presented conflicting arguments and testimony on what caused the damage to Harrah's Project. Harrah's asserts wind blown rain is the cause. MCA asserts it was a single mold infestation. The Insurers assert MCA's choice to install sheetrock on floors that were not yet covered by EIFS panels is the cause. Because none of

19

1    the parties have met their burden of showing there is no genuine issue of material fact

2    regarding the cause of the damage, and because the cause of the damage is material to a

3    determination of the number of occurrences, the Court denies the motions of Harrah's,

4    MCA, Insurers, and Ace for summary judgment on this issue.

5                    **C. Fortuity**

6              The bulk of the parties' arguments center on the issue of whether Defendants'

7    claimed losses were caused by fortuitous events and thus were covered by the excess policy.

8    Resolution of this issue requires the Court to address several questions: 1) does Louisiana

9    recognize the fortuity doctrine; 2) if so, what standard does it use to determine what is

10   fortuitous; 3) which party bears the burden of proof; and 4) considering the answers to the

11   above questions, has either party met its burden of proving no issue of material fact exists

12   regarding what event or series of events caused the damage and whether the cause was

13   fortuitous.

14                 **1. Fortuity Recognized**

15             Under the fortuity doctrine an all-risk policy will not cover a loss that is not

16   fortuitous, or accidental. <u>CXY Chemicals USA v. Gerling Global Gen. Ins. Co.</u>, 991 F.

17   Supp. 770, 780 (E.D. La. 1998) citing <u>U.S. Indus., Inc. v. Aetna Cas. & Surety Co.</u>, 690 F.2d

18   459 (5th Circuit 1982) (applying Louisiana law). The doctrine is based on assumptions

19   about the purpose of the insurance industry: "If risk is central to insurance then certainty is

20   antithetical to it. The requirement that every loss be accidental in some sense is implicit in

21   the very nature of insurance." <u>Id.</u> (citing Stephen A. Cozen and Richard C. Bennett,

22   Fortuity: The Unnamed Exclusion, 20 Forum 222, 222, 224 (1985) (internal citations

23   omitted)).

24             Two Louisiana Courts of Appeal have used the fortuity doctrine when analyzing

25   an insurance case under maritime law. <u>Anders v. Poland</u>, 181 So. 2d 879 (La. Ct. App. 3d

26   Cir. 2002); <u>Walker v. Travelers Indem. Co.</u>, 289 So. 2d 864 (La. Ct. App. 4th Cir. 1974).

1   Another court has applied it in a case based on pure Louisiana law without specifying

2   whether the policy in question contained a specific exclusion for events that were not

3   fortuitous.  Norfolk Southern Corp. v. Cal. Union Ins. Co., 589 So. 2d 201, 207 (La. Ct.

4   App. 1st Cir. 2003).  The Fifth Circuit has assumed that Louisiana recognizes the doctrine.

5   Aetna Cas., 690 F.2d at 461; Alton Ochsner, 219 F.3d at 504.  Additionally, article 1875 of

6   the Louisiana Civil Code states "a fortuitous event is one that, at the time the contract was

7   made, could not have been reasonably foreseen."[8]  Finally, the Louisiana Insurance Code

8   states an insurance contract is based on a contingency. La. Civ. Code Ann. art. 1875;

9   La.R.S. 22:5(9).

10   Harrah's argues the controlling authority is Estate of Patout v. City of New Iberia,

11   in which the Louisiana Court of Appeals declined to apply the known loss doctrine because

12   there was no evidence it had been adopted by Louisiana courts. 849 So. 2d 535, 543 (La.

13   Ct. App. 3d Cir. 2002).  The known loss doctrine is a permutation of the fortuity doctrine

14   that is somewhat narrower, barring coverage of losses known to the insured before the

15   policy is effective. Nat. Fire Ins. Co. of Pittsburgh, Pa. v. Stroh Cos. Inc., 265 F.3d 97, 106

16   (2d Cir. 2001).  Harrah's contends it would be illogical for Louisiana courts to accept the

17   broader exclusions of the fortuity doctrine while rejecting a narrower version.

18   After reviewing the case law and the parties' arguments, the Court concludes

19   Louisiana does apply the fortuity doctrine.  It is not clear that the Anders and Walkers courts

20   were applying only maritime law when they recognized the fortuity doctrine.  Nor is it clear

21   that the Patout case meant to include the broader fortuity doctrine in its rejection of the

22   known loss doctrine.  Additionally, the first Fifth Circuit case holding that Louisiana

23   recognized fortuity was handed down over twenty years ago.  Neither the Louisiana

24   legislature nor the Louisiana Supreme Court have expressly rejected the doctrine since that

25

26   [8]   Harrah's argues article 1875 refers to article 1873, which codifies the doctrine of impossibility of performance by stating "an obligor is not liable for his failure to perform if it is caused by a fortuitous event that makes performance impossible."

1  time. Consequently, the Court grants summary judgement to the Insurers and Ace on this

2  issue and denies summary judgment to the Defendants.

3  ### 2. Objective or Subjective Standard

4       In its applications of the fortuity doctrine under the substantive law of Louisiana,

5  the Fifth Circuit has applied a subjective standard under which damage is fortuitous when,

6  as far as the parties are aware, it is dependent on chance. CXY, 991 F. Supp. at 780

7  (discussion the Fifth Circuit's use of a subjective standard). This is consistent with the

8  general rule, followed by many courts, that negligence does not negate fortuity. Fed. Ins.

9  Co. v. Tamiami Trail Tours Inc., 117 F.2d 794, 796 (5th Cir. 1941) (citing Columbia Ins.

10  Co. v. Lawrence, 35 U.S. 507, 516 (1936)) (noting fire is so often caused by negligence that

11  the insurer must consider that likelihood in its assessment of the risk involved); Aetna Cas.,

12  690 F.2d at 461-62 (quoting Morrison Grain Co., Inc. v. Utica Mut. Ins. Co., 632 F.2d 424,

13  431 (5th Cir. 1980)) (holding "a loss may be fortuitous even if it is occasioned by negligence

14  of the insured").

15       The Insurers argue the Fifth Circuit is correct in applying the fortuity doctrine but

16  incorrect in its choice of a subjective standard. To support their position they cite article

17  1875, which states an event is fortuitous if it meets the objective standard of not having been

18  reasonably foreseeable at the time the contract was made. La. Civ. Code Ann. art. 1875.[9]

19  Additionally, they assert the district court in CXY decided not to utilize article 1875 based

20  on the Fifth Circuit's use of an objective standard in Aetna Cas. without realizing that article

21  1875 did not exist when Aetna was decided.

22       Defendants argue the Insurers must prove a higher specific intent standard

23  showing "knavery" or "design." They cite two cases in support: the marine case, Walker,

24  requiring "wilful misconduct measuring up to knavery or design" to substantiate a fortuity

25

26      [9] Harrah's again argues article 1875 refers to the impossibility of performance doctrine rather than the fortuity doctrine.

22

1    exclusion; and the latest case from the Louisiana Court of Appeals, Norfolk, requiring

2    specific intent. 289 So. 2d at 871; 589 So. 2d at 207.

3         Having considered the substantive law and the parties' arguments, the Court

4    concludes the standard for determining whether damages are caused by events that are not

5    fortuitous is a subjective one and requires awareness of unreasonable risk on the part of the

6    insured. Although the Court agrees that under settled law the actions in question must

7    exceed mere negligence, the Court is not convinced the law requires specific intent or

8    knavery or that a proof of gross negligence would not be sufficient.

9         Nor is it clear the objective standard from article 1875 is relevant. Article 1875 is

10   from section 2 of the Civil Code's Chapter 6, entitled Impossibility of Performance. The

11   other articles in section 2 also refer to a fortuitous event in the context of situations in which

12   a party's performance under a contract becomes impossible because of a fortuitous event.

13   La. Civ. Code Ann. articles 1873-1878. Under article 13 of the Civil Code, which requires

14   courts to interpret "laws on the same subject matter . . . in reference to each other," it is

15   inappropriate to transfer the article 1875 definition to the entirely different area of insurance

16   coverage.

17        ### 3. Burden of Proof

18        "'[A]lthough in an 'all risks' policy the burden is plainly on the underwriter to

19   show an exception to coverage applies, the burden of proof is on the insured to show that the

20   loss was proximately caused by the peril insured against and claimed under.'" Cambre v.

21   Travelers Indem. Co., 404 So. 2d 511, 513 (La. Ct. App. 4th Cir. 1981) (quoting

22   Northwestern Mut. Life Ins. Co. v. Linard, 498 F.2d 556 (2d Cir. 1974)). The Fifth Circuit,

23   applying Louisiana law on fortuity, places the burden on the insurer to prove an exclusion

24   and on the insured to prove the loss was caused by a fortuitous event. CXY, 991 F. Supp. at

25   780 (citing Morrison Grain, 632 F.2d at 430).

26        Consequently, Harrah's bears the burden of showing a fortuitous event caused the

23

1 losses. Once they have done this, the burden is on the Insurers to negate that proof.

2 **4. Genuine Issue for Trial**

3 In addition to their discussions of case law, the parties have each presented

4 evidence on causation and on the statistical likelihood that Shreveport would receive the

5 amount of rainfall that fell there in 2000.[10] Defendants argue MCA did not underestimate

6 the likelihood of rain in Shreveport and took reasonable measures to protect the Project from

7 the rain that occurred.[11] The Insurers and Ace argue MCA used the same construction

8 techniques it would have used in Las Vegas and knew or should have known water damage

9 and mold were inevitable in an open building in Shreveport's climate.

10 Because the Court concludes there is a genuine issue of material fact regarding

11 what caused the damage to the Project, there also is an issue regarding whether that cause

12 was fortuitous. Although the litigants have presented voluminous amounts of evidence,

13 neither side has met its burden of proving there is no issue of material fact for trial.

14

---

15     [10] The litigants also have urged the Court to apply two cases to declare that as a matter of law
16 large amounts of rain are or are not fortuitous. However, both of the cases, Farnsworth v. Sewerage
& Water Bd. and Davis v. Tillman, which cites Farnsworth, determine fortuity as it applies in an
17 impossibility of performance case and are not on point. 139 So. 638, 641 (La. 1932); 370 So. 2d 1323,
1325 (La. Ct. App. 2d Cir. 1979) (citing Farnsworth, 139 So. at 641). The Louisiana Supreme Court
18 did apply the fortuity doctrine in a maritime insurance case to find bad weather was not fortuitous when
it was to be expected at that time of year. 181 So. 2d at 881. However, from this the Court may
19 conclude only that if rain caused the damage to the Project it was fortuitous if it was unexpected. The
Insurer's expert testified that weather cannot be predicted and that builders should expect and prepare
20 for extremes of weather that have previously occurred in the area. (E. Ethridge Depo. at 13:14-20,
21 14:25, 70-71.) MCA's expert testified the rain that fell in Shreveport in 2000 was a statistical anomaly.
(J. Wilson Depo. 114-116.) Thus a genuine issue remains for trial regarding what weather was
22 "expected" in Shreveport.

23     [11] MCA also argues that even if they were negligent in the construction of the Project, costs
24 for "loss or damages resulting from . . . defective design or specifications, faulty material, or faulty
workmanship" are included in the policy coverage. (JA, Ex. 1 at § 8.B.) However, this argument does
25 not address the issue of what caused the damage to the Project. It also does not address the issue of
how this clause of the policy applies when the faulty workmanship results from the deliberate actions
26 of an insured party rather than from the negligence of an employee. Consequently, at present MCA's
contention is not of use in resolving the matter before the Court.

1  Consequently, the Court will deny the motions of MCA, Harrah's, the Insurers, and Ace for

2  summary judgment on this issue.

3  **V.     CONCLUSION**

4           IT IS THEREFORE ORDERED that Harrah's Motion for Partial Summary

5  Judgment on the Issue of Occurrence (Doc. #177); Harrah's Motion for Partial Summary

6  Judgment on the Issue of Drop Down/Attachment (Doc. #178): and Harrah's Motion for

7  Partial Summary Judgment on the Issue of Fortuity (Doc. #179) are hereby partially

8  GRANTED to the extent of the Court's findings below and DENIED in all other respects.

9           IT IS FURTHER ORDERED that Motion for Partial Summary Judgment by

10  Defendants Marnell Corrao Associates, Inc., MCA of Louisiana, Inc, and Anthony Marnell

11  II, Chartered Regarding Drop Down (Doc. #186); Motion for Partial Summary Judgment by

12  Defendants Marnell Corrao Associates, Inc., MCA of Louisiana, and Anthony Marnell II,

13  Chartered Regarding Occurrence (Doc. #187); and Motion for Partial Summary Judgment

14  by Defendant Marnell Corrao Associates, Inc., MCA of Louisiana, Inc., and Anthony

15  Marnell II, Chartered, Regarding Fortuity (Doc. #189) are hereby partially GRANTED to

16  the extent of the Court's findings detailed below and DENIED in all other respects.

17           IT IS FURTHER ORDERED that Plaintiffs' Introduction and Statement of Facts

18  and Motions for Sumary Judgment with Supporting Briefs on "Occurrence," "Drop Down,"

19  and "Fortuity" (Doc. #180) is hereby partially GRANTED to the extent of the Court's

20  findings detailed below and DENIED in all other respects.

21           IT IS FURTHER ORDERED that Involuntary Plaintiff Ace American Insurance

22  Company's Motion for Summary Judgment (Doc. #185) is hereby partially GRANTED to

23  the extent of the Court's findings detailed below and DENIED in all other respects.

24           IT IS FURTHER ORDERED that the Court makes the following findings:

25  A.  Drop Down

26           1.  The policy is ambiguous as to drop down.

2.  Harrah's drafted the policy.

3.  Both the doctrine of construction against the drafter and the doctrine of reasonable expectations militate in favor of a finding that the policy does not require the Insurers to drop down.

4.  The policy does not require the Insurers to drop down when the primary carrier is insolvent.

B.  Occurrence

1.  The policy is ambiguous regarding the definition of occurrence.

2.  Louisiana law defines occurrence as the event that caused the damage.

3.  Issues of material fact remain regarding what caused the damage to the Project.

C. Fortuity

    1.  Louisiana law applies the fortuity doctrine in insurance cases.

    2.  The standard for determining fortuity requires awareness of unreasonable risk or gross negligence.

    3.  The burden is on the insured to show the damage was caused by a fortuitous event.

    4.  Issues of material fact remain regarding what caused the damage to the Project and whether that cause was fortuitous.

DATED: June 28 , 2004

PHILIP M. PRO
Chief United States District Judge

27